[Civ. No. 4389. Fourth Dist. Feb. 17, 1953.]

ELECTRICAL PRODUCTS CORPORATION et al., Respondents, v. COUNTY OF TULARE, Appellant.

R. N. Nickerson, Ralph B. Jordan and Boris S. Stanley for Appellant.

Dannenbrink & Graves and Bradley & Bradley for Respondents.

BARNARD, P. J.—This is an action for damages caused by the overturning of a truck owned by the plaintiff corporation and driven by the plaintiff Blomquist. This truck weighed 7 or 8 tons, having a steel boom about 25 feet long extending from the rear end up over the cab and being loaded with tools, ladders and other equipment and supplies.

At 4:30 p.m. on April 6, 1950, Blomquist was driving this

truck south on a paved county road running between Dinuba and Visalia. There was a cattle-pass under this road some 10 miles north of Visalia. While this pass was similar to a bridge or culvert, as far as the road was concerned, it was built for the passage of cattle and not for the flow of water. On this day an adjoining landowner had allowed irrigation water to escape and this underpass was nearly full of water. This water loosened the dirt underneath causing the pavement along the north edge of the underpass to bend downward, making a depression which was variously described by different witnesses. A highway patrol officer, who arrived shortly after the accident, described it as a saucer-like depression about 18 inches wide and 5 inches deep at the deepest part, the deepest part extending about 2 feet before it tapered off. Other witnesses estimated the depth all the way from 4 inches to 12 inches. Photographs taken a half hour after the accident show a varying drop of the road at the north edge of the underpass, and support the officer's testimony as to its nature and extent.

As Blomquist approached this underpass he was traveling from 40 to 45 miles an hour. The road was straight and dry, the weather was clear, and there were no cars on the road in front of him. He saw the depression in the road when he was 50 or 60 feet from it. He said he applied his brakes immediately, but his skid marks began south of the underpass and extended for 153 feet. As the truck struck the rut its steering mechanism broke and the car overturned at the south end of the skid marks, causing the damage complained of.

The complaint in this action alleged that the defendant permitted this road, at this point, to exist and continue in a dangerous and defective condition which was known to it, that this accident occurred by reason of this dangerous and defective condition; and that certain damage to the truck and injury to Blomquist were directly and proximately caused thereby. The answer denied these allegations and alleged contributory negligence. The court, sitting without a jury, found that the defendant county permitted this road "to exist and continue in a dangerous and defective condition" at this spot; that this dangerous condition, consisting of a deep cave-in in the surface of the road was known to the county; that the county "did not take action reasonably necessary to protect the public against the condition"; that this accident occurred "as a direct result of the negligence of said defendant in failing to take reasonable precautions and actions reason-

ably necessary to protect the plaintiffs from said dangerous and defective condition in said road''; and that none of the injuries or damages suffered by the plaintiffs were proximately caused and contributed to by the negligence and carelessness of the driver of the truck. Judgment was entered against the county, awarding $3,165 to the plaintiff corporation and $2,531.16 to Blomquist.

The county has appealed from the judgment contending that the findings, to the effect that it did not take action reasonably necessary to protect the public against the existing condition in this road, are not supported by the evidence. It is also contended that the respondents were guilty of contributory negligence as a matter of law; that the court erred in failing to find on the issue as to whether a reasonable time had elapsed after notice in which to take other steps, if they were necessary, to remedy this defective condition; and that the trial court's interpretation of the Public Liability Statute would impose upon counties extreme burdens not within the scope of that statute. The respondents contend that the findings are supported by the evidence; that the existence of the dangerous and defective condition of this road was clearly established; that the signs which were posted were not adequate and not properly posted; that what legally should have been done and what was actually done were questions of fact which are controlled by the findings; that the question of contributory negligence was one of fact and there is no evidence of such negligence; that there was no error in failing to directly find whether or not a reasonable time had elapsed after notice since such a finding may be implied from the other findings, and since any finding on that issue would necessarily be adverse to the appellant; and that the standard of care and reasonableness of the steps taken to protect the public, as required by the Public Liability Act, must necessarily be weighed by the trier of fact.

The respondents' liability rests upon the provisions of the Public Liability Act (Gov. Code, § 53051) in effect at the time of the accident. So far as material here, this section provided for such liability where the governing board had knowledge or notice of the defective condition and ''for a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition.'' It appears, without dispute, that a defective condition here existed and that the appellant had received notice thereof.

While there is some question with respect to the "reasonable time" element, the main question is as to whether the action taken by the county was sufficient to constitute "action reasonably necessary to protect the public," as required by the statute.

A Mrs. Swearington testified that she drove over this road the Saturday night preceding the accident; that she felt quite a jolt which she later decided was at this underpass; that her sleeping husband was not awakened by the bump; and that she did not report the matter to anyone connected with the county or its road maintenance. Mr. Switzer, who was in charge of all county roads, testified that he drove over this road on the first or second day of April and noticed no defect. Mr. Price, who was in charge of road maintenance in that road district, testified that he inspected the roads regularly, that he went over this road three or four days before the accident, and that there was no defect there or any water in the underpass at that time. He further testified that he received a report of the defect about noon on April 6, and that he sent an employee to put out lights and signs because it was impossible to get anybody out there to take care of it at that time. Mr. Lovero testified that on the afternoon of April 6, he was the only employee working in the maintenance yard when the yard clerk came out and reported that a complaint had been received about this defective condition. He loaded some signs and flares in a pickup truck and went to the cattle-pass. He placed one sign about 300 feet south of the pass and another 12 feet south of the pass, on the east side of the road; and placed another about 12 feet north of the pass, and one about 300 feet north of the pass on the west side of the road. He also left a flare pot by each sign. While posting signs he saw the depression, which he estimated to be about 4 inches deep, and saw cars pass over the depression without any trouble. As he left he drove over the depression, going about 15 miles an hour.

Blomquist testified that he did not see any warning sign prior to the accident; that after the accident he and a Mr. Turney, who was riding with him, walked back to the underpass and "checked up on the signs"; that he could see no signs except one about 10 feet from the "bridge" which was lying face down beside the road; that this sign was about "2 x 2½ feet square"; that it had legs on which to stand. Turney testified that at that time he saw a sign lying down 6 or 8 feet from the north side of the bridge and along the

west side of the road; that there was a flare pot beside it; that he also saw another sign with a flare pot beside it about 100 yards south of the culvert and on the left side of the road as you went toward Visalia; and that these flare pots were the kind you usually see on the road to indicate danger. The highway patrol officer, who arrived a few minutes after the accident, testified that he made his usual investigation of the accident but that he did not observe any signs. He testified 14 months after the accident, and the evidence indicates that his memory was not perfect. Some photographs were taken by a professional photographer about half an hour after the accident. One of these, looking south from the underpass, shows this officer pacing the distance from the underpass to the overturned truck, and shows the sign and flare pot on the east side of the highway nearly opposite the overturned truck. Another photograph, looking south, shows that sign and flare pot and also shows another flare pot on the same side of the road a few feet south of the underpass. Another photograph, looking north, shows the depression, a flare pot near the west edge of the pavement a few feet north of the underpass, and a sign standing some distance to the north on the west side of the highway.

Mrs. Simas, a witness called by the respondents, testified that just prior to the accident she was driving south on this road about 20 feet behind the truck in question; that as they approached the underpass from the north she saw posted on the west edge of the road a sign reading ''Dangerous but Passable''; that the sign in the photograph last above referred to was the sign they had passed just before the accident; that she remained at the scene of the accident for some 30 minutes; that ''I saw the pictures made, so they (the signs) weren't put thereafter''; that the sign was white with red letters; that she was 20 feet behind the truck as she passed the sign, and she clearly saw the sign there; and that ''he went on his side of the white line so he undoubtedly passed by.'' She also testified that she saw the sign on the south side of the underpass which appears in the photographs, that this sign also read ''Dangerous but Passable,'' and that she could not say whether or not there was another sign lying down immediately north of the underpass. She also testified that she had traveled north on this road about 10 o'clock that morning and had seen these same signs in these positions at that time. There was evidence that these signs were the usual type of warning signs customarily used, that the two signs some 100 yards

from the underpass on the east and west sides of the road, respectively, were signs standing up on legs, and that they read "Dangerous but Passable" in red letters. While the evidence, with respect to the two signs placed near the underpass on each side of the road, is not so complete there is some evidence that these signs read "Slow." There is no evidence as to how or when the sign near the bridge on the west side of the road was knocked down and no evidence of anything which could charge the appellant with notice of that fact. (*Stockton Automobile Co.* v. *Confer,* 154 Cal. 402 [97 P. 881].)

██ A public agency is not an insurer of safety to travelers on its streets (*George* v. *Los Angeles,* 11 Cal.2d 303 [79 P.2d 723]), and a public agency is not bound to keep its public ways so as to preclude the possibility of injury or accident (*Nicholson* v. *Los Angeles,* 5 Cal.2d 361 [54 P.2d 725]). ██ A plaintiff must prove all facts necessary to establish the liability of the public agency (*Meyer* v. *City of San Rafael,* 22 Cal.App.2d 46 [70 P.2d 533]). It appears, without conflict, that a defective condition here existed; that the county's agents received notice of this only a few hours before this accident happened; that extensive repairs were required and men were not available to make the repairs that day; and that an employee was sent as soon as possible to put up warning signs. While there is some conflict as to the exact hour when these signs and flare pots were placed in position, it appears without conflict that they were so placed at least an hour before this accident happened. While the respondent Blomquist stated that he did not see the signs it conclusively appears that at least one sign on each side of the road, about 100 yards from the underpass, was actually in position as the truck approached the underpass and that the four flare pots were then in position, all of these being alongside the pavement with nothing to prevent their being seen by anyone traveling along this road.

██ Ordinarily, the sufficiency of the warning of the dangerous condition or whether the action taken is such as is reasonably necessary to protect the public under the circumstances is one of fact. (*Rose* v. *Orange County,* 94 Cal. App.2d 688 [211 P.2d 45]; *Sandstoe* v. *Atchison, T. & S. F. Ry. Co.,* 28 Cal.App.2d 215 [82 P.2d 216].) Under some circumstances, it has been held that the physical conditions or jogs or offsets in a street may be equivalent to warning signs "and as readily visible to the alert driver as a sign informing him of the condition, there being nothing to con-

ceal the real condition or to deceive the operator of an approaching automobile while driving at a lawful rate of speed and with due caution." (*Waldorf* v. *City of Alhambra*, 6 Cal.App.2d 522 [45 P.2d 207].) ■ A duty rests on a driver to see that which is clearly visible and which would be seen by anyone exercising ordinary care. (*Huetter* v. *Andrews*, 91 Cal.App.2d 142 [204 P.2d 655].) It would seem that this would be especially true with respect to commonly used warning signs placed in a proper position. If the placing of such signs, where the repairs cannot be immediately made, does not constitute the action reasonably necessary to protect the public, required by the statute here involved, the only reasonable alternative would be for the public bodies to place barricades and prevent all use of the streets or roads until repairs could be made. This would be an unreasonable hardship on the traveling public and in many cases is entirely unnecessary. There was evidence that many cars passed safely over this depression shortly after the accident; that one of these was a paint truck; and that two ladders on this truck "jarred very hard" but did not fall off. It would be unreasonable to stop all use of such a road, to the great inconvenience of careful drivers, because a few drivers might disregard such warning signs. A further consideration here is that the truck involved was not only one of great weight but unusually top-heavy.

■ The appellant took some action to protect the public against this defective condition by placing the usual warning signs in the customary manner, and doing this promptly after receiving the first knowledge or notice. The only question is whether the action thus taken was sufficient to constitute the "action reasonably necessary" required by the statute. Where there is no dispute with respect to the facts in this regard this question comes close to being one of law. Assuming, however, that it is one of fact the question remains whether there was sufficient substantial evidence to support the finding that action which was reasonably necessary under the circumstances was not taken.

The evidence shows, without conflict, that only a few hours elapsed after notice of the condition was received; that the road crews were busy elsewhere and men were not available to make repairs that day; that the usual and ordinary warning signs were placed in position promptly; and that at least one of those signs and two flare pots, affecting southbound traffic, were there and plainly visible at the time.

Whether the sign near the underpass was knocked down before the truck passed, or at that time, is immaterial on this issue. There was no evidence that repairs could have been made before the accident happened, and no evidence tending to indicate that any better warning should have been given in view of the existing condition as disclosed by the evidence. The undisputed evidence strongly indicates that the action taken by the appellant was such as was "reasonably necessary" under the circumstances, within the meaning of this statute. There is no substantial evidence which is sufficient to support the finding to the contrary. The evidence that the respondent driver failed to see the warnings which were plainly visible is not sufficient for that purpose.

Under the views above expressed, it is unnecessary to consider the other points raised. The judgment is reversed.

Griffin, J., and Mussell, J., concurred.